## TAXATION OF LIFE INSURANCE COMPANIES.

[Superior Court of Cincinnati, Special Term.]

RUDOLPH K. HYNICKA, TREASURER, v. THE UNION CENTRAL LIFE
INSURANCE COMPANY.

Decided, August, 1906.

*Taxation—Debits and Credits of Life Insurance Companies—Deferred
Dividends—Reserve Fund—Bank Deposits—Contingent Obligations
—What Constitutes a Debt Owing—Checks for Proposed Loans or
Investments not a Debit—Uniform Taxation—Double Taxation—
Tax Returns of Corporations and Individuals—Sections 2730, 2731,
3648, 3598-4, and 1094.*

1. Accumulated deferred dividends or undivided profits arising on life
   rate endowment policies of a life insurance company are not,
   under the Ohio statutes of taxation, to be considered as a "legal
   *bona fide* debt owing" by the insurance company, and can not
   therefore be legally deducted from the company's "credits" when
   its return for taxation is made up.
2. Neither can the reserve fund of a life insurance company be con-
   sidered a debt owing to the policy holders, in the sense that it
   may be deducted from the *credits* and thus escape taxation.
3. Bank deposits are not relieved from taxation merely because it
   may appear that the funds have been checked against. Nor is *good
   faith* in the issuing of the checks involved. The lien of the state
   attaches to the deposits on the tax day, unless it appears that prior
   thereto the checks were presented for payment; or that the bank
   by certification or otherwise irrevocably committed itself to the
   holder. In other words, where it appears that the money on deposit
   on tax day is still subject to the legal demand of the depositor it is
   taxable, notwithstanding the fact that there may be checks out-
   standing against said fund.

HOFFHEIMER, J.

This was an action brought by the treasurer of Hamilton
county to recover omitted taxes. By virtue of the statutes pro-
vided in such behalf, the auditor of the county proceeded to
investigate the returns of defendant company for the years 1897
to 1901, inclusive, and for the amounts found by him to be
omitted he charged simple taxes. Recovery for the amounts so
charged and the penalties is here sought. By agreement between

the parties a jury was waived and the cause was submitted to the court on an agreed statement of facts and also on evidence. The claim of plaintiff involves the right to subject to taxation certain large sums of money on deposit in various local banks in the city of Cincinnati, on the tax day of each of the years in question, less the gross amounts returned by the defendant.

The defendant claims such sums were in effect wiped out by the company's outstanding checks, which had been issued by it for "collateral loans and investments" and for proposed mortgage loans. As the proposed mortgage loans were entered up as completed transactions simultaneously with the issuance of its checks, and inasmuch as these mortgage loans were returned by the company as "credits," the company claims that it indirectly paid taxes on such deposits, and should not again be taxed thereon.

Still another and very important question is to be here determined. Defendant company for the years in question returned for taxation as credits sums running into millions. These "credits" were then wiped out because the "debits" deducted were far in excess of the "credits."

Examining the company's return, we find to be deducted "*re-insurance reserve fund and all outstanding obligations to policyholders*" (Stipulation, p. 18.) This item includes (a) the reserve or re-insurance fund of the company; (b) the accumulated deferred dividends, or undivided or surplus profits of the company's *life rate endowment policies*. The auditor ascertained the amounts deducted from credits on account of "accumulated deferred dividends," arising on the policies of the character mentioned, and then he placed on the duplicate an amount of credits for taxation equal thereto. The contention therefore is, as to the right of the company to deduct from its "credits" as a "legal *bona fide* debt owing," "accumulated deferred dividends" or "undivided profits" arising out of the life rate endowment policies in question.

Addressing ourselves to a consideration of the question as to the "accumulated deferred dividends," I may say, that if it appears that the company's obligation or liability under this life rate endowment policy is *contingent*, then there was no

"legal *bona fide* debt owing," within the purview of the tax statute, and the item was not legally deductible. In other words, the question confronting the court is this: Does the defendant company, by virtue of a policy of the character mentioned, incur an actual certain fixed liability for a certain sum of money, which sum of money, if not due, lacks only falling due to be enforcible by action? Is there an existent debt as contradistinguished from a mere liability which may or may not ripen into a debt? Does the element of time *only* prevent enforcibility of the liability? If so, the obligation may be said to be absolute. *Id certum est, quod reddi certum potest.* Within the meaning of the tax law then, there would be a legal debt "owing." If, on the other hand, there is no definite certain liability due or to become due absolutely and at all events, and the liability is dependent upon a contingency—one which may only ripen on the happening of some contingency, such a liability could not be considered as a debt owing. To ascertain whether there is a debt, it was said in *People* v. *Arguello*, 37 Cal., 525:

"Whether a claim or demand is a debt or not, is in no respect determined by a reference to the time of payment. A sum of money which is certainly and in all events payable, is a debt, without regard to the fact whether it be payable now or at a future time. A sum of money payable on a contingency, however, is not a debt, or does not become a debt until the contingency has happened."

In order, therefore, to ascertain whether the accumulated deferred dividend was a debt, or a debt "owing" and as such, deductible, we must at the outset examine the policy (Exhibit I, Auditor's Finding.) For the policy is the basis of the company's obligation or liability. It is the company's promise to its policy holder. Now, the answer in this case admits that the policy is a contract for one year with an option to renew. If not renewed, the policy *lapses.* In the next place the policy provides that upon failure to pay any of the first three annual premiums the policy *lapses and becomes unenforcible.* After three years' premiums are paid in, the policy may still lapse and be forfeited. Then the policy holder, according to the terms of the policy, has two options: (a) he may take a paid-up policy

for a less amount than the sum named in the policy; or, (b) he may default in payment and take a paid-up non-participating policy for a specified time (one year and forty-two days). Non-participating means that the policy does not participate in the profits (see stipulation, page 21). It is evident, then, that a policy that has not run more than three years may lapse through the default of the policy holder. Certainly, then, it is contingent whether the company will ever be obliged to pay anything on such a policy. If the policy has run more than three years and the policy holder defaults, while he may exercise his option to surrender his policy and receive a paid-up policy for a less sum (according to the table on the back of the policy) it is *contingent* whether he will exercise such option. If he pays for a number of years and defaults and receives a paid-up, non-participating policy for the short period mentioned (one year and forty-two days), it is contingent whether any obligation of the company will mature or ripen, for, obviously, unless the default of the policy holder ensued during that stipulated period (one year and forty-two days) the obligation is at an end, and as to such policy, the company must pay nothing. This analysis of the policy establishes conclusively: first, that as to their life rate endowment policy less than three years old, the company's liability is *contingent;* second, that as to their life rate endowment policies over three years old, the company's liability is likewise *contingent.*

In addition to the uncertainty with regard to any ultimate ripening of the liability as thus revealed, upon still closer scrutiny we find in the policy the following clause:

"The company further agrees to pay to the insured the amount of said insurance at its office in the city of Cincinnati, Ohio, whenever the premiums paid on this policy and its equitable proportion of the company's profits combined, less its share of losses and expenses, equal the amount of the policy."

Now, suppose the policy holder never defaults, what profits is he entitled to? The promise is not to pay profits or dividends, because the profits or dividends may never equal *the face of the policy.* True, the custom or method of the company was to pass a resolution directing a distribution of the net profits to the

various classes of policy holders (stipulation, page 14) and entering the proper credit on each life rate endowment policy, on the life rate endowment register (subsequently on abandoning the register, on the card), yet that entry did not, as contended for by defendant, represent any present liability or existent debt of the company to the particular policy holder so represented.

Counsel for the company *arguendo* contends that the aggregate sum of money credited to the policies of this class on the register or card became a definite fixed sum which the company was under obligation to pay to persons ascertainable at the time of payment. This contention, however, is not tenable. In the first place, the sum so credited certainly was not demandable by any policy holder of that class. The policy holder was in no sense a creditor as to such fund, and if he was not a creditor, there certainly could not be a debt. If defendants' argument were correct, it would suffer the company by its independent act to fix the obligation, whereas, that is fixed by the contract itself, and the contract speaks as to when the company shall pay and under what circumstances. In the event of default by the policy holder, the sum, or sums, credited would be wiped out in whole or in part, and in the event of net loss by the company, independent of any act of the policy holder, all premiums paid in would be wiped out, or at any rate *pro tanto* the net loss. While it would seem the almost uninterrupted prosperity of the company would render the latter *potentia remotissima,* nevertheless the contingency might occur. Once in the history of the company it actually did occur, and then the company, by its own act, recognized that the mere crediting of profits represented no fixed *existent* debt because net losses were deducted by it. So, that, whether "there will be profits or net losses to be deducted" is dependent on wise and successful management, on prosperous conditions generally; in short, on so many things that no rule could be laid down by which it could be said the claim on the endowment feature is bound to become due absolutely and at all events.

Somewhat analogous questions were before this court and the Supreme Court in *Amazon Insurance Company* v. *Cappeller,*

8 Bulletin, 248, affirmed by the Supreme Court, 38 O. S., 560. *Equitable Insurance Co.* v. *Gibson,* 11 Cincinnati *Court Index,* No. 175 (April 27, 1903), decision by R. B. Smith; affirmed in General Term, Dempsey, Ferris, S. W. Smith, JJ.

These cases, it seems to me, are decisive of the questions raised here. Section 2730, Revised Statutes, authorizes the deductions from credits of legal *bona fide* debts owing. In what way can it be said the item "accumulated deferred dividends" thus deducted, was a debt—a legal *bona fide* debt owing? In *Insurance Co.* v. *Cappeller, supra,* our Supreme Court gave us a definition of "a legal *bona fide* debt owing":

"Unless the context requires," said McIlvaine, J., "some other construction, surely the phrase 'legal *bona fide* debts owing by such persons' can mean nothing more than a fixed liability to pay a sum, or sums, certain, due or to become due at all events, to some other person or persons, it being understood, of course, that that is certain which can be made certain."

And in the General Term, when the same case was up for consideration, Harmon, J. (Force and Worthington, JJ., concurring, 8 Bulletin, 248), said:

"If the mere word 'debts' (in 2730) had been used, the meaning of the Legislature might not be so clear as we think it is now, though the word is one which hardly needs definition. A debt is a sum of money due by certain express agreement (2 Bl. Com., 154). 'All that is due a man under any form of obligation or promise' (Bouvier Law Dict.), or if the popular rather than the legal sense is to be taken, 'that which is due from one person to another, whether money, goods or services' (Webster's Dictionary). But the Legislature, by using the words 'legal,' '*bona fide*' and 'owing,' clearly intended to limit the word 'debts' to such actual fixed certain liabilities as if not due, lack only falling due, to be enforcible by action."

In the Cappeller case it was held that the item returned as "reinsurance" or "unearned premiums" (estimated amount of premiums unearned), was not a "legal *bona fide* debt, owing," within the meaning of Revised Statutes, 2730.

"What is the right of the insured, under his contract? To have indemnity in case of loss; nothing more. What is the obligation of the insurer under his contract? To indemnify the in-

sured in case of loss; nothing more.  If no loss occurs during the life of the policy, the assured takes nothing by his contract, and the insurer loses nothing.  It is therefore plain that until a loss occurs the relation of creditor and debtor does not exist between the parties.  It is said that a policy is a valuable thing before a loss covered by it takes place.  How so?  Clearly it does not add to the value of the property insured.  It is not a thing valuable in its use.  It is not an article valuable in trade, but it is such the holder may at any time demand its cancellation and recover the 'unearned premiums,' so-called.  True, the statute secures to the holder such a privilege, but he can not exercise the privilege and hold indemnity also.  The object in obtaining insurance is to secure indemnity against loss, not investment of money.  Hence the right to demand cancellation until exercised is of no taxable value.  After the right to demand cancellation is exercised and the right to indemnity is thereby abandoned, of course the taxable property of the assured is increased and that of the insurer diminished to the extent of the premiums returned or liable to be returned, as above shown."

True, the Cappeller case, as defendant claims, was a fire insurance case, not life insurance, but I am unable to distinguish in principle the one from the other.  The contingencies under which obligations may arise are as uncertain in life as in fire insurance.  True, death is certain to occur, and fire may not; but that death or fire may occur during the life of the policy is the uncertainty which makes the principle laid down in the Cappeller case analogous to life insurance also.  In *The Cincinnati Equitable Insurance Company* v. *Gibson, supra,* we have a fire insurance case also.  The company was a "mutual."  The insured paid in a certain fixed sum of money and received insurance for seven years.  At the expiration of the seven years he was permitted to withdraw his deposit, subject, however, to "losses and charges."  The deposits thus held by the company were sought to be deducted as *"bona fide* debts owing,"  but the court held that these deposits were not debts.

"It may thus happen, said the court, that the losses and charges might consume a part, if not all, that is paid in, and can not be regarded in the language of the Supreme Court in the

Cappeller case as a fixed liability to pay a sum certain, due or to become due at all events, to some other person or persons.''

So, by parity of reasoning, not only may there be no debt in the instant case, no obligation, because of the death of the policy holder, or because of a failure of the liability to ripen or accrue during the life of the policy for the reasons already suggested. but with reference to the endowment feature, *the profits and premiums may never equal the face of the policy*. The liability under the life rate endowment policy is clearly, then, *contingent*—at best a *conditional debt* only, and being so, the ''accumulated deferred dividends'' can not be held to be a ''legal *bona fide* debt owing'' within the definition of the adjudicated cases in Ohio.

The auditor, it will be observed, in investigating the returns of the defendant company, for the three years in question, ascertained the amount due from credits on account of accumulated deferred dividends on the life rate endowment policies. And thereupon he placed upon the duplicate the amount of credits for taxation equal thereto, but nothing was added on the part of the item, namely, *reserve fund or reinsurance fund*. So, that, even if it had been determined that nothing was due because of the deduction of accumulated deferred dividends, if the reserve fund was not a deductible debt, the treasurer ought still to recover under the item as deducted, because if the reserve fund had not been deducted, the company's taxable credits would have been vastly in excess of the amounts placed on the duplicate by the auditor. (For amounts see table, page 20 of stipulation.) *Detroit Fire & Marine Insurance Co.* v. *Hartz*, 132 Mich., 518.

The question then is, was the reserve fund a legal *bona fide* debt owing, to be deducted from the credits? The reserve fund may be said to be that part of the assets of an insurance company that the company may not by statute distribute to its stockholders in dividends. It is a fund set apart by law to safeguard the policy holder. Yet it is not the company's *obligation,* for we have seen that there may never be an obligation in the legal sense. It is practically the estimation of the probability that the insurance company may have to pay on the policies taken out. The fact that the directors are forbidden to declare divi-

dends thereon (Rev. Stats., Section 3602), can not of itself, make it a debt due the policy holder. In *Amazon Insurance Company* v. *Cappeller, supra,* the statute (Rev. Stats., Section 3648) required a reserve fund for the payment of the policy holders, and the court held that it was not a deductible debt. And the General Term, having that same case under consideration, speaking of the reserve fund, said:

"The estimation in money of their chances of their becoming debts does not make them debts in any ordinary sense of the word, any more than the calculations upon the theory or probabilities of how many policy holders may be subjected to suffer loss or surrender their policies, changes any particular ones policy holders may forfeit their rights in the fund by failure to among them from mere policy holders into creditors. The fact remains that none of the losses insured against may ever occur, that none of the outstanding policies may ever be surrendered. So, that, the proposition that counsel for plaintiff must maintain is that the statute has used the word debts in a sense which includes the estimated probabilities of contingent liabilities becoming fixed."

*Kansas Life Association* v. *Hill,* 51 Kans., 636, is a case that seems to me to be decisive. The Kansas statute is similar to ours, except that the reserve fund must be deposited with the state treasurer. In this case it was held, substantially, that the policies were liable to lapse; that the policy holders may forfeit their rights to participate in the fund by failure to pay, that doubtless many would so fail, and that the contingent liability which was not susceptible of computation was not a debt owing in good faith, to be deducted from credits under the law. At page 649, that court said:

"The ownership of all these assets of every kind is in the company alone. It is true that it has contingent liabilities and is in a sense a trustee of the funds in its possession, but the beneficiaries of the trust are not yet determined except as to the ten thousand dollars of losses already accrued. Each and any of the pay their assessments, and many of them probably will. A contingent liability that is not susceptible of computation is not a debt owing in good faith which may be deducted from credits under the tax law, and we fail to find in any of the statutes indicating that it was the intention of the Legislature that the reserve fund of an insurance company could be exempted."

In *Kenton Insurance Company* v. *The City of Covington*, 86 Ky., 213, speaking of the reserve fund, the court said:

"A tax-payer, in listing his property for taxation under the equalization law can not deduct the contingent liabilities, and in this regard the same rule applies to insurance companies that applies to other tax-payers. Therefore, an insurance company, in listing its property for taxation, can not have deducted from its assets its contingent liability to policy holders for losses, or by reason of their right to claim premiums paid in the event of a cancellation of the insurance contract. In this case an insurance company is held liable for taxation upon its reserve fund or unearned premium, although as much as this fund amounts to may be required to pay losses for the year."

At page 215, the court says:

"The insurance company asserts an exemption from taxation of its reserve fund or what is termed unearned premiums on two grounds."

At page 218;

"The act of March 12, 1870, with reference to the payment of dividends requiring that no division shall be made of its reserve fund *does not divest this corporation of its right of property in it,* or to use and invest it for the benefit of the stockholders."

At page 222, the court says:

"The company is the absolute owner and should be compelled to pay the taxes. It may have to pay its entire fund in discharge of its contracts, or the whole of its capital stock; but this affords no reason for the exemption, for if such a rule is adopted as the basis for taxation in the one case, because experience has demonstrated that a certain amount of loss will be annually sustained, then the same rule must apply to all business enterprises and the assessing officer is left to speculate on the chance of loss or the probability of loss left wholly to the judgment of those conducting the business."

See, also, *Peoples Fire Insurance Company* v. *Parker*, 35 N. J. L., 575; *Sun Mutual Insurance Co.* v. *Mayor*, 8 Barber, 450, and *People, ex rel National Surety Co.,* v. *Feilner* (Parker, J.), 166 N. Y., 129 (1901).

Counsel for defendant company, however, insists that said fund is a *debt,* not only because of the language of Section 3602, but also because of the language of Section 3598, Revised Statutes, Subdivision No. 4. This section provides that insurance companies may invest their accumulations:

"In loans upon its policies, not exceeding the reserve or present value thereof, computed according to the American Experience Table of Mortality, with interest at four per cent., *the same being the amount of debts of life insurance companies by reason of their outstanding policies in gross.*"

We have already seen that a similar argument was disposed of by the Kentucky decision already referred to, and as the argument of the able counsel for defendant company contemplates an *exemption* for the benefit of this *life insurance company,* it is well, inasmuch as exemptions find little favor with the courts, to note in passing, that this section is not found in the chapter on taxation, but the chapter relating to insurance companies, and is a provision directing what may be loaned by an insurance company on its policies. While it is true the obligations of the company on its policies are by this section called "debts," could it have been intended that they were to be considered debts within the meaning of Section 2730, Revised Statutes? The statute, it will be observed, does not denominate them "legal *bona fide* debts owing," and although the company's obligation is defined by the policy, as we have already seen, there may, in fact, never be any ultimate liability on the policy. The obligation of the company being essentially contingent, how can it be metamorphosed by any legislative declaration? As was urged by counsel for the treasurer, while the Legislature may say, that contingent obligations for the purposes of taxation should be considered fixed and legal *bona fide* debts owing, nevertheless, the obligation in its nature would still be and remain a contigent obligation. Aside from the grave doubt that the Legislature ever intended to create such an exemption, even if it did so intend to exempt an insurance company from taxation on the reserve fund, such statute would be unconstitutional, because violative of the rule requiring uniformity of taxation (Article XII, Section 2, Constitution of Ohio). It would

in effect, permit insurance companies to deduct contigent liabilities from credits, although other corporations and natural persons are deprived of the privilege. In other words, its effect would be to impose an unequal burden of taxation, favoring some corporations as against other corporations and individuals. That is prohibited also by Article XIII, Section 4 of the Constitution, which provides that the property of corporations now existing, or hereafter created, shall forever be subject to taxation, the same as the property of individuals. As was said by Harmon, J., in *Insurance Company* v. *Cappeller, supra:*

"Undoubtedly the rule of equality in taxation enjoined by the Constitution would be violated, if such estimates of contingent liabilities were permitted as to corporations when they are not possessed as to individuals."

See, also, *Bank* v. *Hines*, 3 O. S., 1; *Standard Life and Accident Ins. Co.* v. *Detroit*, 95 Mich., 466, and *State Bank* v. *Britton*, 105 U. S., 322.

The defendant's interpretation of Section 3593 would, as we have seen, render that section unconstitutional. Not so, however, the interpretation placed thereon by the court  This being so, the well-established rule of statutory interpretation must govern. "Whenever a statute is susceptible of two constructions, of which the one would make it unconstitutional, the other constitutional, the latter is to be adopted." Endlich on Interpretation of Statutes, Section 178, and cases cited.

In view of the foregoing reasons, the reserve fund must be held not to be a "legal *bona fide* debt owing," and therefore, was not deductible.

While I am cognizant of the fact that there are several cases that hold contrary views to those herein expressed, the principal ones cited, it will be found, can not be considered in point, for the reason that they turn either upon the non-forfeitable character of the policies in question (the obligation or liability thereunder being existent, or fixed), or on statutes or state constitutions essentially different from ours.

It appears from the evidence that large sums of money were on deposit to defendant's credit, in three banks of the city of Cincinnati, on the tax days in question. Certain gross amounts

were returned by defendant company for taxation. The balance apparently to defendant's credit was reduced or wiped out, as defendant claims, and was not returned for taxation, because of an enormous amount of outstanding checks. The defendant's return was based upon its check-book, but the treasurer now seeks to tax the actual balances in bank, as shown by the books of the banks, on the day preceding the second Monday in April, in the years in question, without allowing deductions for the outstanding checks, none of which were presented or paid by the local banks until after the tax days of the respective years in question. The question whether defendant was justified in reducing amounts in bank by deducting therefrom the outstanding checks, is dependent for its answer upon two other questions: First, Were there outstanding checks as a matter of fact? Second, Assuming that there were some outstanding checks, as matter of law, were such checks properly deductible from defendant's local balances? The "checks" in question fall within *four* distinct classes, and the stipulation sets out these so-called checks by tables (see pp. 11 and 12 of the stipulation).

Table 1. This table represents checks drawn directly on the local banks. These were presented and paid after tax day.

Table 2. Checks drawn on New York banks. These checks were presented and paid after tax day.

Table 3. Checks on local banks that were never presented or paid, but canceled.

Table 4. Checks on New York banks that were never presented or paid, but canceled.

Let us first consider Tables 3 and 4. The evidence shows that these checks, as a matter of fact, never left the home office of the company. Every definition of a check assumes that it is a promise to somebody, but such pieces of paper were promises to no one. They were never delivered. On the contrary, they were canceled. The defendant, therefore, wrongfully deducted such checks from defendant's taxable deposits. The treasurer is entitled to recover the taxes on the amounts so wrongfully withdrawn from defendant's return, likewise the penalty thereon prescribed by law. I find the amounts thus wrongfully withheld from taxation are as follows:

| YEAR. | OMITTED DEPOSITS. |
|-------|-------------------|
| 1897  | $  8,750          |
| 1898  | 269,850           |
| 1899  | 5,080             |
| 1900  | 6,270             |
| 1901  | 481,220           |

Taking up next the checks in Table 1. If we assume that these checks were actually issued by defendant company, the evidence shows that they had not been presented and paid on the tax days in question. The question then is, were defendant's funds in the local banks upon which such checks were drawn subject to the legal demand of defendant company on the tax days in question? "Money" on deposit and subject to demand is taxable. Section 2731, Revised Statutes, reads as follows:

"The term money or monies shall be held to mean and include every deposit which the person owning or holding in trust or having a beneficial interest therein is entitled to withdraw in money on demand."

The law, therefore, requires that if a person has money on deposit subject to his demand—by that is meant legal demand—he must return the same for taxation. That the money was in the banks is conceded. It is not sufficient, in order to avoid taxation on a bank deposit, to merely issue checks thereon, because a check is nothing more than an order on the fund, "payable instantly on demand." It is simply an *executory promise* to pay the sum specified in the check according to the terms thereof. The mere giving of the check, is not an assignment *pro tanto* of the fund. It follows, therefore, that until the check is presented or paid or the bank in some way committed to the holder or payee the promise may be recalled. That is to say, the drawer may countermand up to the last moment. Up to that time the funds are subject to the drawer's legal demand.

The view thus expressed is in accord with the authorities generally and is fairly deducible from *Kahn* v. *Walton*, 46 O. S., 195; *Covert* v. *Rhodes*, 48 O. S., 66; *Metropolitan Bank of Cincinnati* v. *The C., H. & D. Ry. Co.*, 54 O. S., 60; *Bank* v. *Yardly*, 165 U. S., 648 *Bank* v. *Brewing Co.*, 50 O. S., 151.

These checks, the evidence shows, were given for "collateral loans or expenses." But because given to pay a debt, the rule is not altered, nor is the *bona fides* of the transaction involved. A check is subject to countermand before it is presented, or the bank committed to the payee, or before the check is cashed. Now, we know the local banks were in no sense committed to the payment of these particular checks. They were not certified, nor were they presented for payment on or before the tax days in question. In *Ambach* v. *Sims, Treasurer,* the precise question was determined. In that case, Bigger, J., charged the jury as follows:

"Some evidence has been introduced as to certain balances in the bank to the credit of the defendant, but the defendant testified that he had given checks against these amounts. The law in such cases is that money in bank subject to be drawn out on the check of a person depositing, is taxable so long as it remains in bank subject to his order, and the giving of checks, unless they were cashed, would not exempt it from taxation."

The jury found for defendant. On error, the Circuit Court of Franklin County (Sullivan, Wilson and Summers, JJ.), reversed the judgment but sustained the above charge, and in the judgment the court said:

"The verdict and judgment below should have been in favor of the plaintiff as to the taxes upon the balances said to have been in bank subject to the check of the defendant on the dates on which the taxes upon personalty became a lien."

(The above case is unreported, but the printed record of the Supreme Court proceedings is before me).

Affirmed by Supreme Court 71 O. S. 545.

So, that, even if the checks were *bona fide* and given for outstanding obligations, it would make no difference, because debts are not deductible from bank deposits (*Payne* v. *Watterson,* 37 O. S., 131). The auditor, therefore, properly added monies aggregating the amounts of such checks; the deposits were in no sense reduced by such checks. The treasurer is, therefore, entitled to recover the taxes on such omitted amounts and the penalty prescribed by law. (For Table 1, see stipulation, p. 11.)

We come now to consider the checks in Table 2. There are

two reasons why the alleged outstanding checks in this class can not be held to have reduced the deposits in the local banks. First. The checks were countermandable, precisely as were the checks in Table 1. Second. The checks were not "*outstanding*," as a matter of fact. The authorities referred to (*supra,* under Class 1) apply with equal force to checks of this class, unless it should appear that there was some agreement by which the banks, after receiving the printed notice (Exhibit M) had in some way, expressly or impliedly, become irrevocably committed to their payment. Was there such an agreement? On page 8 (stipulation) we find:

"There was no agreement between the local banks of deposit and the defendant as to the mode of charging the defendant's deposit on account of these New York drafts, but the practice of the local banks of deposit was to make a book entry, charging defendant's deposit account with the draft only when it was reported paid by its New York correspondent."

It is thus apparent that there was no agreement *binding* the bank *as of the time of notice* (Exhibit M). On the contrary, the evidence shows the defendant's credit was only charged *afterwards* on payment of the New York draft by the bank. The defendant's credit, or rather its taxable funds *pro tanto* these New York checks were not charged on the tax days in question on any book of the bank, but defendant company claims that in legal contemplation, defendant's account was so charged, and that defendant, at the time of the notice (Exhibit M) lost the legal control over such funds, aggregating the amount of the New York checks, because, it is urged, the agreement of these parties (defendant and the banks) was precisely like (although it lacked the form) of a certification by the bank of the checks so drawn; that upon the filing of the printed notice (Exhibit M) and the banks forwarding letter advising payment, the banks were brought into *privity.* The contention is ingenious, but can not be sustained by the evidence or the law. If the filing of the printed notice (Exhibit M) and the issuing by the local banks of its letter to the New York banks advising payment was tantamount to certification, the evidence failed to show any state of facts by which it can be successfully main-

tained that the bank had become irrevocably committed to the payee. If it had been expressly agreed by the local banks and defendant company that its deposits or its "credit" at the local banks were to be immediately charged with the amounts of the checks drawn at the time the banks were notified (Exhibit M) and at the time that the local banks advised the New York banks to pay, a different case might have arisen, provided, also, authority could be produced to show that a bank, by pre-arrangement with its depositor and another bank, can "certify" a check of its depositor, not on its own account, but on a bank in which the depositor has no funds; and, provided, further that it could be shown under the evidence that, after such "certification," the check came into the control of the payee, and that the payee was then and there legally entitled to present such check for payment.

Unfortunately for defendant's theory, the evidence leaves no room for legal legerdemain. The sum sought to be taxed was physically in the local banks on the tax days in question. The burden of proof was, therefore, on defendant to show that these deposits were wiped out, legally, at least, if not actually. If we were to concede, for the sake of argument, that the transaction in some way rose to the dignity of "certification," the defendant still failed to show that the banks were irrevocably committed to the particular payees of the checks on the tax days in question. The checks were not mailed or delivered to the payees on or before the said tax days. The defendant company will answer by saying that the financial agent of defendant, to whom the checks were mailed (checks for mortgage loans were never mailed to the payee directly) was, by agreement, to be also considered the agent of the proposed mortgagor or borrower or payee. The checks obviously could not be in the hands of the *drawer or his agent* and at the same time in the hands of the *payee or his agent*. If they were in the hands of the drawer or his agent, they were not "outstanding" checks. If they were in the hands of the payee or his agent, they would be outstanding checks, provided all the conditions to be complied with had been satisfied. The defendant failed to prove that the conditions (upon fulfillment of which defendant's financial agent, in his

role of agent for defendant, was to turn these checks over to himself as the agent of the payee) had been fulfilled.

The entire method of proceeding shows conclusively that the very purpose of sending these checks to defendant's financial agent (and *never* to the payee directly) was to retain control of the same until the liens on the proposed security were wiped out or the title made clear or other conditions satisfied. Certainly the financial agent, in his capacity as agent for the borrower or payee, even if he had manual possession of the checks in question, could have no greater legal right to the checks on or before the tax days (if such checks at such times were in his possession) than his principal, the payee, could have had at such particular time. In short, *the defendant has utterly failed to show that the checks were in the control of the payee's agent or in the control of the payee on the tax days in question.* It has failed to prove that the payees' agent or the payees were legally entitled to a single check on said tax days. This being so, what becomes of the claim that the local banks were in privity? What claims did the proposed payees have as against these local banks on or before the tax days in question? Were not such deposits still subject to the "latest order" of the drawer of the checks? Were not, in short, the deposits subject to the defendant's legal demand on the tax days in question?

In my judgment, these checks were in no sense different in principle from those in Class 1. They were countermandable, just as we have seen those checks were. The local banks were in no sense committed to the proposed payees at the time the tax lien attached to said funds. There was no certification nor anything equivalent to it. At the very best, the local banks, seeking to accommodate a valuable client, instead of certifying, in effect agreed to pledge their own credit to the New York banks, they guaranteeing the New York banks that, if they paid the checks thus drawn on them by defendant company, they (the local banks) would in turn pay them. But such an *external promise* to pay, if it can even be called such, did not deprive the defendant of legal control over its funds in the banks, nor could it operate to defeat the lien of the state.

If, however, I have erred in these deductions, and it is to be held that the novel practice of these parties was in effect a certification, and had the effect of a certification, the defendant must still fail, because there was no proof that on or before the tax days in question checks were delivered to the payees or their agents and that then and there the payees were legally entitled to them. It follows, therefore, that the deposits withheld from taxation were wrongfully withheld. These monies, then, were taxable under Section 2731, Revised Statutes.

The fundamental rule forbidding *duplicate taxation* is not violated by the conclusions I have reached, although the defendant company returned as "credits" (mortgage loans) the amounts thus found to be money in bank. Simultaneously with the drawing of the checks, the defendant company, it seems, entered upon the mortgage loan register, as completed mortgage loans, the amounts thus checked out. Because the defendant company for its own purposes chose to consider the mortgage loan transaction as completed at that moment, that did not make it a closed transaction; nor could defendant company, by such action, alter the true character of the funds in bank. We have seen that the monies thus withheld from taxation were monies in bank and were subject to taxation. As bank deposits are subject to taxation, they can not be wiped out with debts, as was sought to be done in the case at bar (*Payne v. Watterson*, 37 O. S., 121). Moreover, as the debts exhausted all the "credits" returned by the company because of the wrongful deduction by it of "reinsurance reserve fund and outstanding obligations to policy holders," no tax was paid by this company either directly or indirectly on these amounts in bank. The claim, therefore, is wanting in merit either at law or equity.

I find that the total amount of bank deposits omitted in the years in question, and upon which the treasurer is entitled to recover is

| | |
|---|---|
| 1897 | $ 89,200 |
| 1898 | 349,500 |
| 1899 | 119,400 |
| 1900 | 60,800 |
| 1901 | 674,000 |

I find the "credits" omitted in the years in question on which recovery should be had

| 1897 | ............................... | $1,095,700 |
|------|--------------------------------|------------|
| 1898 | ............................... | 823,200 |
| 1899 | ............................... | 1,092,100 |
| 1900 | ............................... | 1,254,500 |
| 1901 | ............................... | 1,259,200 |

I find that the total amount of values omitted, together with the taxes thereon, to be

| YEAR. | OMITTED AMOUNTS. | TAXES. |
|-------|------------------|--------|
| 1897 | $1,184,900 | $31,028.68 |
| 1898 | 1,172,200 | 29,669.31 |
| 1899 | 1,211,500 | 31,184.01 |
| 1900 | 1,315,300 | 34,171.49 |
| 1901 | 1,933,200 | 47,982.02 |

In addition to which, I find that the treasurer is entitled to recover $8,701.37, which is five per centum allowed by law by virtue of Section 1094, Revised Statutes.

In view of the foregoing, under the law and the evidence, I find for the plaintiff in the sum of $182,728.88, and order judgment accordingly.

*Alfred B. Benedict,* for plaintiff.

*Lawrence Maxwell* and *Robert Ramsey,* for defendant.